## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
|     ) | |
|     *Plaintiff*     ) | |
|     ) | |
| v.     ) | Docket No. 03-181-P-H |
|     ) | |
| WATER QUALITY INSURANCE     ) | |
| SYNDICATE,     ) | |
|     ) | |
|     *Defendant*     ) | |

### RECOMMENDED DECISION ON CROSS-MOTIONS FOR JUDGMENT ON A STIPULATED RECORD

Plaintiff United States and defendant Water Quality Insurance Syndicate ("WQIS") cross-move for judgment on a stipulated record in this action arising from the wreck of a fishing vessel. United States' Motion for Judgment on a Stipulated Record (Docket No. 15); Motion by the Water Quality Insurance Syndicate for Judgment on a Stipulated Record, etc. ("WQIS Motion") (Docket No. 17).[1]

### I. Applicable Legal Standard

"[T]o stipulate a record for decision allows the judge to decide any significant issues of material fact that he discovers . . . ." *Boston Five Cents Sav. Bank v. Secretary of Dep't of Housing & Urban Dev.*, 768 F.2d 5, 11-12 (1st Cir. 1985). The parties have agreed to this procedure, as evidenced by the titles of their respective motions and their submission of a stipulated record (Docket No. 14).

---

[1] WQIS has requested oral argument on the motions. Request for Oral Argument, etc. (Docket No. 22). Because the written submissions fully present the parties' respective positions, and because oral argument will be available should either party file objections to this recommended decision, the request is denied.

1

## II. Stipulated Facts

Gulf of Maine Trawlers, Inc. ("GMT") was a Delaware corporation with a principal place of business in Quincy, Massachusetts and was registered in Maine as a "business corporation (foreign)." Stipulation of Fact (Exh. A to Stipulated Record (Docket No. 14)) ¶ 1. Captain Zenon Gogola was GMT's sole officer and sole shareholder. *Id*. At all material times GMT owned and operated an 81.2-foot diesel-powered steel-hulled stern trawler of 173 gross tons named the Jessica Ann, Official Number D607686. *Id*. ¶ 2. The F/V Jessica Ann was built in 1979 and equipped for offshore ground fishing. *Id*. ¶ 3. The vessel was equipped with a pilothouse, which contained the navigation control station, the main propulsion and machinery controls, steering controls and engine monitoring panel. *Id*. The F/V Jessica Ann was licensed by the Coast Guard to engage in the fisheries trade in the navigable waters of the United States and in the Exclusive Economic Zone and held fisheries permits for, *inter alia*, sea scallops, summer flounder and American lobster. *Id*. ¶ 4.

On February 19 and 20, 2000 the F/V Jessica Ann was manned as follows: Captain Gogola; Ken Davis of Portland Maine; Mike Patterson of Portland, Maine; Mike Williams of Rockland Maine; and Marina Ames of Owls Head, Maine. *Id*. ¶ 5. Gogola had operated the F/V Jessica Ann since 1981 and had been a fisherman for 25 years. *Id*. ¶ 6. Davis had been a member of the crew of the F/V Jessica Ann since late January 2000 and a fisherman for 28 years. *Id*. ¶ 7. Gogola and the crew of the F/V Jessica Ann planned to depart Portland, Maine on February 20, 2000 and head to Wilkinson Basin to fish. *Id*. ¶ 10.

Beginning sometime in the afternoon of February 19, 2000 and continuing until sometime around midnight of the same day, Gogola and the entire crew gather at a tavern in Portland to eat and drink beer. *Id*. ¶ 11. Gogola participated in the eating and beer drinking and observed the crew, including Davis, doing the same. *Id*. ¶ 12. At approximately midnight on February 19, 2000 Gogola

and the crew left the tavern and went to the F/V Jessica Ann. *Id*. ¶ 13. After returning to the F/V Jessica Ann, Davis went to bed and slept, while Gogola drank an additional 3 or 4 beers and worked on the nets. *Id*. ¶ 14.

At approximately 2 a.m. on February 20, 2000 Gogola had Davis roused from his bunk and told Davis to get the F/V/ Jessica Ann underway and proceed to the fishing grounds while Gogola went to his bunk to sleep. *Id*. ¶ 15. Gogola intended for Davis to do so without grounding the vessel, sinking the vessel, discharging oil from the vessel or posing a substantial threat of discharging oil. *Id.* ¶ 16. When Davis heard Gogola's order, he knew that 33 C.F.R. Part 95.020 defined being under the influence of alcohol for a person operating a vessel that is not a recreational vessel as 0.04 blood alcohol concentration ("BAC") and that he exceeded that standard. *Id*. ¶ 18. At no time on February 20, 2000 did Davis intend for the F/V Jessica Ann to ground, sink, discharge oil or pose a substantial threat of discharging oil. *Id*. At the time he received Gogola's order Davis's BAC was approximately 0.22. *Id*. ¶ 19. At the time he gave the order, Gogola's BAC was approximately 0.21. *Id*. ¶ 20. Gogola was aware the Davis's BAC far exceeded .04 at the time he gave the order. *Id*. ¶ 21.

Davis had operated the F/V Jessica Ann without supervision on a previous trip. *Id*. ¶ 22. On February 20, 2000, shortly after 2 a.m., Davis again operated the F/V Jessica Ann without supervision, getting the vessel underway from the Portland Fish Pier. *Id*. ¶ 23. At that time the vessel was loaded with between 8,000 and 12,000 gallons of diesel fuel. *Id*. ¶ 24. The weather at the time was fine, with good visibility, no wind and a ground swell from the east. *Id.* ¶ 26. After the vessel cleared Portland Head Light, Davis lined the vessel up on LORAN line 9960-W-13288.5 and set the autopilot on 150 Magnetic. *Id*. ¶ 25. All navigation equipment appeared to be operating properly and all watertight hatches were closed. *Id*. ¶ 27.

There was a compass deviation card in the pilot house of the vessel, the purpose of which was to state the deviation between the magnetic readings of a compass and known magnetic direction, but Davis did not know if the card was dated or when the compass was last adjusted. *Id*. ¶ 28. Davis did not manually take fixes nor mark the vessel's positions on a chart while operating the F/V Jessica Ann on February 20, 2000. *Id*. ¶ 29. Davis visually observed the flashing red #4 and green #3 buoys marking the channel through West Cod Ledge. *Id*. ¶ 30. He observed two unlighted aids, the N"4" and N"4WC," on radar. *Id*.

There were two main obstructions in the path of the F/V Jessica Ann: Old Anthony Rock and Alden Rock. *Id*. ¶ 31. Both are charted on the National Oceanographic and Atmospheric Agency ("NOAA") Coast Survey Chart Number 3290. *Id*. Alden Rock is marked by a red flashing buoy. *Id*. The buoy marking Alden Rock was on station and working properly on February 20, 2000. *Id*.

At approximately 4:00 a.m. on February 20, 2000, while proceeding at approximately 8 knots, Davis heard a loud "wham" as the F/V Jessica Ann struck something in the water, which Davis believed was Alden Rock. *Id*. ¶ 32. Gogola heard the noise and went to the pilot house. *Id*. ¶ 33. Soon after Gogola arrived at the pilot house, a high bilge level alarm sounded. *Id*. ¶ 34. Gogola went to the engine room and discovered a cracked weld in a seam that was located below the starboard fuel tank. *Id*. ¶ 35. The compartment was flooding rapidly. *Id*. Gogola started all four bilge pumps but they did not keep up with the flooding. *Id*. Gogola returned to the pilot house to call the Coast Guard but the VHF radio was inoperative. *Id*. At approximately 4:30 a.m. on February 20, 2000 Gogola gave the order to abandon ship. *Id*. ¶ 36. After donning survival suits, Gogola and the crew boarded the life raft. *Id*. ¶ 37. Williams shot off three flares. *Id*.

During the morning hours of February 20, 2000 Boatswain's Mate Second Class Daniel L. Sharp was on duty as the Officer of the Day at Coast Guard Station, South Portland, Maine. *Id*. ¶ 38.

After receiving a telephone notification that a flare was sighted off Cape Elizabeth, Sharp dispatched Coast Guard Patrol Boat 41463 to respond. *Id.* The patrol boat reported seeing a life raft near Alden Rock and recovered Gogola and the crew of the F/V/ Jessica Ann from the raft. *Id*. ¶ 39. The F/V Jessica Ann sank in approximately 130 feet of water about 1 nautical mile southwest of Alden Rock, in the vicinity of Old Anthony Rock. *Id*. ¶ 40. Because the patrol boat reported that the crew appeared to be intoxicated, Sharp calibrated the station's ALCO-SENSOR III, a device that measures BAC. *Id.* ¶ 41.

After the patrol boat arrived and the crew were examined by emergency rescue personnel, Sharp noticed a strong odor of alcoholic beverages in the vicinity of the crew. *Id*. ¶ 42. Breath tests were performed on Gogola and each of the crew and Gogola performed three field sobriety tests. *Id*. At 7:18 a.m. Gogola registered 0.11 BAC. *Id*. ¶ 43. He failed two of the field sobriety tests. *Id*. At 7:35 A.m. Davis registered 0.12 BAC. *Id*. ¶ 44. At 8 a.m. Williams registered 0.165 BAC. *Id*. ¶ 45. At 8:15 Patterson registered 0.237 BAC. *Id*. ¶ 46. At 8:45 Ames registered 0.00 BAC. *Id*. ¶ 47.

On October 17, 2000 Gogola pleaded guilty in this court to one count of operating a commercial fishing vessel in a grossly negligent manner on February 20, 2000 in violation of 46 U.S.C. § 2302(b) and 33 C.F.R. parts 95.015(b) and 95.050(a). *Id*. ¶ 48. On October 24, 2000 Davis pleaded guilty in this court to one count of operating a commercial fishing vessel under the influence of alcohol on February 20, 2000 in violation of 46 U.S.C. § 2303(c) and 33 C.F.R. Parts 95.015(b) and 95.050(b). *Id*. ¶ 51.

The Coast Guard federal on-scene coordinator initiated a removal action pursuant to 33 U.S.C. § 1321(c) on February 26, 2000. *Id.* ¶ 53. Due to hazardous sea and weather conditions the action was not completed until July 25, 2000. *Id*. Removal costs associated with the action were paid from the Oil Spill Liability Trust Fund pursuant to 33 U.S.C. §§ 1321(s) and § 2712(a)(1)(A) in the amount

of $930,510.09. *Id*. On January 15, 2003 GMT paid the United States $80,906.21, leaving an unpaid balance of $849,603.88. *Id*. ¶ 54.

On January 27, 2003 the United States filed suit against GMT to recover the remaining $849,603.88 expended from the Oil Spill Liability Trust Fund to respond to the sinking of the F/V Jessica Ann. *Id*. ¶ 55. As of March 27, 2003 WQIS was informed, through counsel, of the filing of the action, that GMT did not intend to defend the action and that an answer was due on or before April 8, 2003. *Id*. WQIS did not make an appearance in the case. *Id*. On May 22, 2003 this court entered judgment against GMT for $849,603.88 plus costs and attorney fees plus post-judgment interest. *Id*. ¶ 56.

On August 6, 1999 GMT had purchased a one-year marine oil pollution insurance policy covering F/V Jessica Ann against liability arising under the Oil Pollution Act from a discharge of oil or the substantial threat of discharge of oil from the F/V Jessica Ann. *Id*. ¶ 57. WQIS underwrote the policy, which bears policy number 29-07548 (the "Policy"). *Id*. WQIS provided coverage to GMT following the sinking of the F/V Jessica Ann until sometime in June, 2000. *Id*. ¶ 58. On June 30, 2000 WQIS informed GMT that coverage for the government's claim was excluded under the Policy because the sinking of the F/V Jessica Ann arose from the willful misconduct of Gogola, who was intoxicated when the F/V Jessica Ann got underway and who knew that Davis was intoxicated when he ordered Davis to get the vessel underway. *Id*.

### III. Discussion

#### A. Applicability of 24-A M.R.S.A. § 2904

In this action, filed on July 24, 2003, the government seeks to recover from WQIS under the Policy satisfaction of the judgment it obtained against GMT. Complaint (Docket No. 1). The claim is based on 24-A M.R.S.A. §§ 2903 and 2904, Maine's "reach and apply" statutes governing insurance policies. *Id*. at 3-4. WQIS first argues that this statute does not govern the Policy. WQIS Motion at 6-9; Opposition of the Water Quality Insurance Syndicate to the United States' Motion for Judgment, etc. ("WQIS Opposition") (Docket No. 19) at 2-3. Judge Hornby certified that question to the Maine Supreme Judicial Court sitting as the Law Court. Docket No. 30. The Law Court replied that 24-A M.R.S.A. § 2904 does reach marine insurance policies like the one at issue in this action. *United States v. Water Quality Insurance Syndicate*, __A.2d __, 2005 ME 49 (2005) (Docket No. 35) at 5-6.

#### B. Interpretation of 24-A M.R.S.A. § 2904

The parties move on to the merits of the claim. The Policy contains an exclusion that is at the center of the parties' dispute.

> Notwithstanding any provision in this Policy to the contrary, this Policy does not provide coverage for any liability, loss, damage, cost or expenses arising from:
>
> * * *
>
> (6) The willful misconduct of the Assured, or the willful misconduct of the owner or operator of the Vessel if within the privity or knowledge of the Assured . . . .

Water Quality Insurance Syndicate Policy Number 29-07548 (Exh. A to Stipulation of Fact). Part III, Article A. If this exclusion does not apply, the policy clearly provides coverage for liabilities under the Oil Pollution Act of 1990 arising from the discharge or substantial threat of a discharge of oil. *Id.* Part I, Article A. Maine's reach-and-apply statute provides that a judgment creditor — here, the

7

United States — is entitled to have insurance money applied to the satisfaction of its judgment against a third party "if when the right of action accrued, the judgment debtor was insured against such liability and if before the recovery of the judgment the insurer had had notice of such accident, injury or damage." 24-A M.R.S.A. § 2904. The statute provides the insurer with six specific defenses, none of which is invoked by WQIS. WQIS does not dispute that it had notice of the accident, injury or damage before the recovery of the judgment. It asserts that the willful-misconduct exclusion[2] in the Policy is triggered by the intoxication of Gogola and Davis and that the exclusion means that GMT was not insured against the liability that arose from the sinking of F/V Jessica Ann. WQIS Motion at 10-15; WQIS Opposition at 3-9. The government contends that WQIS is asserting a "defense" that is not among those enumerated in the statute, that the statutory list is exclusive and that this court therefore may not consider the willful misconduct exclusion at all. Memorandum of Law in Support of United States' Motion for Judgment, etc. ("Government Motion") (Docket No. 16) at 10-11; Government Opposition at 4.

WQIS bears the burden of proving the applicability of a policy exclusion; any ambiguity as to the meaning of the policy language is construed against the insurer. *American Guar. & Liab. Ins. Co. v. Keiter*, 360 F.3d 13, 17 (1st Cir. 2004). Before dealing with that question, however, the court must address the government's argument that the exclusion should be disregarded when deciding whether GMT was insured against the liability at issue. The government contends that this question is answered by the decision of the Maine Law Court that "section 2904 contains an exclusive list of defenses available to insurers in reach and apply actions," *Michaud v. Mutual Fire, Marine & Inland*

---

[2] WQIS contends that the definition of the term "willful misconduct," which is not defined in the Policy, must be supplied by New York law, WQIS Motion at 11, because the policy provides that it will be interpreted under federal maritime or New York law. Policy, Part IV, Article B. The government responds that federal maritime law provides a definition of "willful misconduct" that is applicable to this case, but that, even if there were no federal maritime law on point, application of New York law would work to the government's benefit. Memorandum of Law in Support of United States' Objection to WQIS' Motion for Judgment, etc. ("Government's
(*continued on next page*)

*Ins. co.*, 505 A.2d 786, 789 (Me. 1986), because in that case the insurer contended that there was no coverage for the claim at issue due to the insured's breach of a cooperation clause in the insurance contract, *id*. at 787-88. However, a breach by the insured of a contract provision that deprives him of coverage otherwise available differs in kind from an exclusionary clause in the insurance contract that provides no coverage for a given factual situation as an initial matter. An exclusion does not result from a breach of the insurance contract; it arises automatically given the presence of certain circumstances. In *Hunnewell v. Liberty Mut. Fire Ins. Co.*, 588 A.2d 300 (Me. 1991), the Law Court considered a defense to a claim under section 2904 to the effect that an exclusion in the policy excluded coverage for the injuries at issue and held that the insurer could not "be estopped from asserting its unambiguous family exclusion endorsement as a defense to this action" on the basis asserted by the plaintiff, *id*. at 303. There was no consideration in *Hunnewell* of the specific argument raised in this case by the government, but the quoted language on its face appears to support the position of WQIS here. The Law Court again considered exclusionary policy language in *Meiners v. Aetna Cas. & Sur. Co.*, 645 A.2d 9 (Me. 1994), where the trial court had denied the insurer summary judgment on a claim under section 2904. The trial court had held that the exclusion clause in the policy was ambiguous and accordingly construed it against the insurer. *Id*. at 10. The Law Court held that the exclusion was "express[] and unequivocal[]," *id*., and reversed. Again, there was no express consideration of the question whether the presence of an otherwise factually applicable exclusion in the insurance policy at issue meant that the judgment debtor was not insured for purposes of section 2904, but the Law Court's treatment of the question that was presented is inconsistent with a view that the list of defenses in section 2904 prevents an insurer from relying on the language of its exclusion in opposing a claim under section 2904.

---

Opposition") (Docket No. 18) at 4-6. I will consider both sources in evaluating the parties' positions.

9

Despite the language in *Michaud*, I conclude that the interpretation of section 2904 pressed here by the government would invalidate all exclusions in most policies of insurance at issue in reach-and-apply actions in Maine. That result cannot reasonably have been intended by the Maine Legislature. If that were the state of the law, tortfeasors whose tortious acts would otherwise be excluded from coverage under the applicable policy of insurance could merely allow judgment to be entered against them and thereby ensure that the injured party could nonetheless recover from the torfeasors' insurers, thereby protecting the insured's own assets. Section 2904's enumerated defense of fraud or collusion would not apply to situations in which the injured third party and the tortfeasor were strangers or otherwise made no agreement to obtain coverage under the policy by this approach. I conclude that the most reasonable construction of the plain language of section 2904 is that the third party must establish that there is coverage under the policy at issue and that the insurer had notice of the underlying action or damage, before the question of the application of the exclusive defenses listed in the statute is reached. Contrary to the government's argument, United States' Reply to Defendants' Opposition (Docket No. 21) at 2-3, the *Hunnewell* and *Meiners* decisions may not be distinguished on the ground that the exclusion clauses in the insurance policies at issue in those cases were unambiguous. The Law Court's decision in *Michaud* does not mention whether the cooperation clause in the policy at issue was ambiguous.[3]

### C. Willful Misconduct

---

[3] The government's contention that WQIS waived any reliance on the willful-misconduct exclusion by failing to intervene in the underlying action against GMT, Government Motion at 10-11, is not supported by the only authority cited in support by the government, *Michaud*, 505 A.2d at 788. In *Michaud*, the Law Court held only that the insurer's due process rights were not violated by the fact that it received notice of the underlying action only after the entry of default on the question of liability. 505 A.2d at 789-90. The issue of waiver was not considered. The question of the existence of insurance coverage could not have been before the court considering the government's claim against GMT. Accordingly, I see no basis for application of the doctrine of waiver or, for that matter, the doctrine of estoppel.

10

The government next contends that the exclusion at issue here does not apply because the intoxication of Gogola and Davis did not constitute willful misconduct[4] nor was it the proximate cause of the sinking of the vessel which in turn led to the oil cleanup for which the government seeks reimbursement. Government Motion at 11-16.  It is at this point that the choice of applicable law becomes an issue because the policy itself does not define "willful misconduct."  The policy provides that "the law applicable to the interpretation of this Policy of insurance and the rights and obligations of WQIS and the Assured hereunder shall be federal maritime law or, in the absence of federal maritime law, the law of the State of New York."  Policy, Part IV, Article B.  The government relies on federal case law on this issue; WQIS relies on New York law.  Government Motion at 12-16; WQIS Motion at 11-12.

The policy makes clear that federal maritime law takes precedence over state law in interpreting the policy, should federal maritime law exist on point.  In construing a marine insurance policy which apparently did not include an express exclusion for willful misconduct, the Second Circuit held that, even if the damage at issue would not have occurred but for the gross negligence of a vessel's crew, "[o]nly 'wilful misconduct,' measuring up to 'knavery' or 'design,' will suffice . . . . True, the judge, in the last paragraph of his opinion, referred to the gross negligence as if it constituted wilful misconduct.  There we think he erred." *New York, New Haven & Hartford R.R. Co. v. Gray*, 240 F.2d 460, 464 (2d Cir. 1957) (defendant's employees found water entering carfloat and nonetheless allowed float to be towed, during which cargo fell off the sinking float). Many years later, the Second Circuit, in a case in which the marine insurance policy provided coverage for "the unforeseen result of an intentional act," considered a request that it abstain under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), by applying the so-called "fortuity

---

[4] There appears to be no dispute that Gogola's actions or failures to act may be deemed those of the insured, GMT.  *See* WQIS
(*continued on next page*)

11

rule" used by federal courts construing marine insurance policies. *Youell v. Exxon Corp.*, 48 F.3d 105, 107, 109-11 (2d Cir. 1995). The insurers argued that the common-law rule[5] that all-risk policies in marine insurance contracts only cover losses caused by fortuitous events excludes coverage for losses caused by the insured's recklessness — in this case the operation of a vessel by a captain who was drunk when the vessel grounded and who the vessel's owner knew to be an alcoholic — relieved them of liability. *Id*. at 107, 110. The court concluded that recklessness "falls somewhere between intent to do harm, which includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence.' *Id*. at 111 (citation and internal punctuation omitted). Unfortunately, the *Youell* court did not resolve the question whether coverage for instances of recklessness caused by intoxication is excluded by the "fortuity rule;" it did note that older federal case law holding that the insurer is not liable for damages because the insured acted by fraud or design. *Id*. at 111; *see also Orient Mut. Ins. Co. v. Adams*, 123 U.S. 67, 71-72 (1887).

I agree with the government, Government Motion at 13, that the evidence establishes that neither Gogola nor Davis intended that the F/V Jessica Ann be grounded or that it sink; there is no evidence of fraud or collusion in the stipulated record. The issue then becomes whether the federal maritime law has answered the question left open by *Youell*: whether recklessness[6] resulting from voluntary intoxication is "willful misconduct" or a "fortuitous event." A seaman who suffers injury as a result of intoxication has no claim against the vessel or her owners. *The S.S. Berwindglen*, 88 F.2d 125, 127-28 (1st Cir. 1937) (calling this standard "well-settled law"). The intoxication of Gogola

---

Motion at 10.

[5] The Second Circuit expressly found that the "fortuity rule" was a creature of federal, not state, law. *Id.* at 110.

[6] The government relies, Government Motion at 14-15, on *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 578 (9th Cir. 1995), in which the Ninth Circuit observed that a failure to take fixes was "grossly and extraordinarily negligent." Davis did not take fixes in this case. Stipulation ¶ 29. However, this characterization neither determines whether such a failure was "willful misconduct" nor whether this (*continued on next page*)

and Davis in this case does appear to come within the definition of "willful misconduct" for purposes of the Warsaw Convention, *International Mining Corp. v. Aerovias Nactionales de Colombia S.A.*, 57 A.D. 2d 64, 67-68, 393 N.Y.S.2d 405, __ (1977), but the Warsaw Convention is not part of maritime law. The possible fact that "[n]o court has yet decided to expand the 'willful misconduct' clause of an [Oil Pollution Act] liability insurance contract to include recklessness based on alcohol consumption," Government Motion at 13, does not and cannot mean that federal maritime law has determined that such conduct is not included within the scope of the term. My search has located no federal case law that answers the question left open by *Youell*.

The court therefore should consult New York law on this point. WQIS relies on *International Mining* to support its contention that New York law defines willful misconduct to include the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences, but, as I noted above, that decision deals only with interpretation of the Warsaw Convention as it applies to airlines, 57 A.D.2d at 66-69, and cannot reasonably be read to establish New York law at all. Neither party has cited New York law that defines willful misconduct for the purposes of maritime insurance, or even for insurance in general, and I have not been able to locate any.

The government also contends that the intoxication of Gogola and Davis was not the proximate cause of the grounding and sinking of the F/V Jessica Ann, suggesting this as an alternate reason to adopt its position. Government Motion at 13-16.[7] As WQIS points out, WQIS Opposition at 7, the

---

omission would or could have occurred absent Davis's intoxication.

[7] WQIS contends that the government is judicially estopped to make this argument. WQIS Opposition at 6-9. Judicial estoppel is a doctrine that prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant in a prior legal proceeding. *Graham v. Smith*, 292 F.Supp.2d 153, 157 (D. Me. 2003). The following factors "inform" the decision whether to apply judicial estoppel: (1) is the later position clearly inconsistent with the earlier position?, (2) did the earlier position persuade a court, so that judicial acceptance of the later position would suggest that one court was misled?, and (3) is there an unfair advantage or detriment? *Id*. WQIS contends that the government's convictions of Gogola and Davis that arose out of the sinking of the F/V Jessica Ann judicially estop it from arguing here that their intoxication was not the proximate cause of the sinking. WQIS Opposition at 6-7. (*continued on next page*)

13

concept of "proximate case" is not really at issue in this case. Rather, the Policy excludes coverage for losses "arising from" willful misconduct. Policy, Part III, Article A(6). The First Circuit has characterized "arising out of" as a "well-established phrase." *Murdock v. Dinsmoor*, 892 F.2d 7, 8 (1st Cir. 1989). In admiralty, "proximate cause, . . . is defined as that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened." *Ente Nazionale per L'Energia Electtrica v. Baliwag Navigation, Inc.*, 774 F.2d 648, 655 (4th Cir. 1985). My research has located no federal case in which the terms "arising from" or "arising out of" was defined in connection with the law of admiralty. Under New York law,

> [w]hen used in a policy exclusion the words "arising out of" are deemed to be broad, general, comprehensive terms ordinarily understood to mean originating from, incident to, or having connection with the operations [at issue]. [T]he New York Court of Appeals held that "arising out of" language in an exclusion clause is unambiguous and is to be applied broadly in the form of a "but-for" test in determining coverage.

*U.S. Underwriters Ins. Co. v. Zeugma Corp.*, 1998 WL 633679 (S.D.N.Y. Sept. 15, 1998), at *3 (citations and some internal quotation marks omitted). Whether the New York definition or the definition used by the First Circuit in construing a municipal liability insurance policy is used,[8] the evidence in the stipulated record establishes that the sinking of the F/V Jessica Ann was incident to, flowed from or had a connection with the intoxication of Gogola and Davis. Contrary to the government's argument, Government Motion at 14-16, neither the fact that Davis managed to navigate the F/V Jessica Ann successfully through the harbor nor the fact that he might have failed to take manual fixes or have set the autopilot without knowing whether the compass was properly adjusted

---

However, the two positions are not clearly inconsistent and adoption of the government's position in this case would not and could not mean that this court was misled when it accepted the guilty pleas of Gogola and Davis. WQIS bases its argument on this issue in part on a report of the Coast Guard's investigation of the sinking. *Id.* at 8-9. That report is not part of the stipulated record and may not be considered under 46 U.S.C. § 6308(a).

[8] "These words ordinarily are held to mean 'originating from,' 'growing out of,' 'flowing from,' 'incident to' or 'having connection with.'" 892 F.2d at 8.

14

even if he were sober means that it would be "unduly speculative" to conclude that the sinking arose out of the intoxication.

It therefore becomes necessary to decide whether the intoxication of Gogola and Davis constituted willful misconduct, in the absence of definitive federal or New York case law on point. It seems logical to me that if a seaman has no cause of action for injuries incurred on a vessel while he was intoxicated, then it is reasonable to conclude that voluntary intoxication of a vessel's captain and the man he put at the helm of a fishing vessel constitutes willful misconduct by both individuals which may be ascribed to their employer. Accordingly, I recommend that the court grant the motion of WQIS for summary judgment and deny that of the government.

### D. Amount of Coverage

If the court adopts my recommendation, it will not reach the issue of the amount of coverage available under the policy at issue. I will discuss that issue here in case the court disagrees with my recommendation. WQIS contends that the policy has a limit of $500,000. WQIS Opposition at 10-11. The government does not respond to this argument.[9] The government stated in its motion that the policy provided "coverage for [Oil Pollution Act] liability . . . up to $500,000" under Part I, Article A and "coverage for debris removal to prevent a substantial threat of discharge of oil . . . up to $1,000,000" under Part I, Article F. Government Motion at 3. WQIS asserts that only Part I, Article A is applicable to this incident. WQIS Opposition at 10. The only portion of the stipulated record that refers to the activity that generated the damages sought by the government is paragraph 53 of the stipulated record, which merely states that the Coast Guard "initiated a removal action" on February 26, 2000 which was not completed until July 25, 2000 and that the costs associated with this action were $930,510.09. Stipulated of Fact ¶ 53. In the absence of any evidence that the Coast Guard

---

[9] The government seeks to recover $849,603.88, plus costs, fees and post-judgment interest. Government Motion at 17.

15

salvaged any cargo of the F/V Jessica Ann, removed its wreck or any debris in furtherance of its efforts to stop a discharge or release of oil, or otherwise met the terms of Article F of the policy, the government's recovery must be limited to the $500,000 coverage provided in Article A.

### IV. Conclusion

For the foregoing reasons, I recommend that the government's motion for summary judgment (Docket No. 15) be **DENIED** and that the motion of Water Quality Insurance Syndicate for summary judgment (Docket No. 17) be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 26th day of April, 2005.

/s/ David M. Cohen  
David M. Cohen  
United States Magistrate Judge